**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

MARTIN JOHNSON, Individually and on
Behalf of All Others Similarly Situated,

Plaintiff,

v.

PROGENICS PHARMACEUTICALS,
INC., ERIC J. ENDE, BRADLEY L.
CAMPBELL, DAVID W. MIMS, KAREN
JEAN FERRANTE, ANN L.
MACDOUGALL, GÉRARD BER and
HEINZ MÄUSLI,

Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.  1:20-cv-02847

**CLASS ACTION COMPLAINT FOR
VIOLATIONS OF SECTIONS 14(a) AND
20(a) OF THE SECURITIES
EXCHANGE ACT OF 1934**

**JURY TRIAL DEMANDED**

Plaintiff Martin Johnson ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      This action is brought as a class action by Plaintiff on behalf of himself and the other public holders of the common stock of Progenics Pharmaceuticals, Inc. ("Progenics" or the "Company") against the Company and the members of the Company's board of directors (collectively, the "Board" or "Individual Defendants" and, together with Progenics, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, and Regulation G, 17 C.F.R. § 244.100, in connection with the proposed merger (the "Proposed Transaction") between Progenics and Lantheus Holdings, Inc. ("Lantheus").

2.      On October 1, 2019, the Company entered into the original agreement and plan of merger ("Original Merger Agreement"), pursuant to which the Company's shareholders would

receive 0.2502 of a share of Lantheus common stock for each share of Progenics stock they own (the "Original Merger Consideration"). Upon completion of the merger, Progenics shareholders would own approximately 35% and Lantheus shareholders would own approximately 65% of the common stock outstanding in the combined company.

3.      On February 20, 2020, the Board caused the Company to enter into a revised agreement and plan of merger (the "Merger Agreement"), pursuant to which the Company's shareholders will receive 0.31 of a share of Lantheus common stock for each share of Progenics common stock they own, and a contingent value right ("CVR") that will entitle its holder to receive the a pro rata share of aggregate cash payments equal to 40% of U.S. net sales generated by PyLTM (18F-DCFPyL) in calendar years 2022 and 2023 in excess of $100 million and $150 million, respectively. Upon completion of the merger, Progenics shareholders will own approximately 40% and Lantheus shareholders will own approximately 60% of the common stock outstanding in the combined company.

4.      On November 12, 2019, in order to convince Progenics shareholders to vote in favor of the Proposed Transaction, the Board authorized the filing of a materially incomplete and misleading Form S-4 Registration Statement (the "S-4") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act.   The materially incomplete and misleading S-4 violated both Regulation G (17 C.F.R. § 244.100) and SEC Rule 14a-9 (17 C.F.R. § 240.14a-9), each of which constitutes a violation of Sections 14(a) and 20(a) of the Exchange Act. On March 16, 2020, following the execution of the new Merger Agreement, the Board authorized the filing of a materially incomplete and misleading Form S-4/A Registration Statement (the "S-4/A") with the SEC that did not correct any of the violations present in the S-4. On March 19, 2020, the Board authorized the filing of a Form 424B3 Joint Proxy

Statement/Prospectus that still did not correct the materially incomplete and misleading nature of the S-4. The Board has scheduled a special shareholder meeting on June 16, 2020 to vote on the Proposed Transaction.

5.     While touting the fairness of the Merger Consideration to the Company's shareholders in the S-4/A, Defendants have failed to disclose certain material information that is necessary for shareholders to properly assess the fairness of the Proposed Transaction, thereby violating SEC rules and regulations and rendering certain statements in the S-4/A materially incomplete and misleading.

6.     In particular, the S-4/A contains materially incomplete and misleading information concerning: (i) the financial projections for the Company that were prepared by the Company and relied on by Defendants in recommending that Progenics shareholders vote in favor of the Proposed Transaction; and (ii) the summary of certain valuation analyses conducted by Progenics' financial advisor, BofA Securities Inc. ("BofA") in support of its opinion that the Merger Consideration is fair to shareholders, on which the Board relied.

7.     It is imperative that the material information that has been omitted from the S-4/A is disclosed prior to the forthcoming vote to allow the Company's shareholders to make an informed decision regarding the Proposed Transaction.

8.     For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, based on Defendants' violation of: (i) Regulation G (17 C.F.R. § 244.100); and (ii) Rule 14a-9 (17 C.F.R. § 240.14a-9). Plaintiff seeks to enjoin Defendants from holding the shareholder vote on the Proposed Transaction and taking any steps to consummate the Proposed Transaction unless, and until, the material information discussed below is disclosed to Progenics shareholders sufficiently in advance of the

vote on the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

10.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

11.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because Progenics maintains its principal executive offices in this District.

## PARTIES

12.     Plaintiff is, and at all relevant times has been, a holder of Progenics common stock.

13.     Defendant Progenics is incorporated in Delaware and maintains its principal executive offices at One World Trade Center, 47th Floor, New York, NY 10007. The Company's common stock trades on the NASDAQ under the ticker symbol "PGNX."

14.     Individual Defendant Eric J. Ende has been a director of Progenics since November 2019.

15.     Individual Defendant Bradley L. Campbell has been a director of Progenics since June 2016.

16.     Individual Defendant David W. Mims has been a director of Progenics since November 2019.

17.     Individual Defendant Karen Jean Ferrante has been a director of Progenics since January 2014.

18.     Individual Defendant Ann L. MacDougall has been a director of Progenics since November 2019.

19.     Individual Defendant Gérard Ber has been a director of Progenics since November 2019.

20.     Individual Defendant Heinz Mäusli has been a director of Progenics since November 2019.

21.     The Individual Defendants referred to in paragraphs 14-20 are collectively referred to herein as the "Individual Defendants" and/or the "Board."

## CLASS ACTION ALLEGATIONS

22.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of Progenics (the "Class").   Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

23.     This action is properly maintainable as a class action because:

a.      The Class is so numerous that joinder of all members is impracticable.  As of March 13, 2020, there were approximately 87,000,000 shares of Progenics common stock outstanding, held by hundreds of individuals and entities scattered throughout the country.   The actual number of public shareholders of Progenics will be ascertained through discovery;

b. There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i) whether Defendants disclosed material information that includes non-GAAP financial measures without providing a reconciliation of the same non-GAAP financial measures to their most directly comparable GAAP equivalent in violation of Section 14(a) of the Exchange Act;

ii) whether Defendants have misrepresented or omitted material information concerning the Proposed Transaction in the S-4/A in violation of Section 14(a) of the Exchange Act;

iii) whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

iv) whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Transaction based on the materially incomplete and misleading S-4/A.

c. Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d. Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.      The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f.      Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g.      A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

### I.      The Proposed Transaction

24.      Progenics is an oncology company focused on the development and commercialization of targeted medicines and artificial intelligence to find, fight and follow cancer. The Company's pipeline includes therapeutic agents designed to precisely target cancer and prostate-specific membrane antigen targeted imaging agents for prostate cancer.

25.      On February 20, 2020, Progenics and Lantheus issued a joint press release announcing the new Merger Agreement, which states in pertinent part:

> NORTH BILLERICA, Mass. & NEW YORK--(BUSINESS WIRE)--Lantheus Holdings, Inc. (NASDAQ: LNTH) ("Lantheus"), parent company of Lantheus Medical Imaging, Inc. ("LMI"), a leader in the development, manufacture and commercialization of innovative diagnostic imaging agents and products, and Progenics Pharmaceuticals, Inc. (NASDAQ: PGNX) ("Progenics"), an oncology company developing innovative medicines and artificial intelligence to find, fight and follow cancer, today announced that they have entered into an Amended and Restated Agreement and Plan of Merger (the "Amended Agreement") which amends the previously announced definitive Agreement and Plan of Merger dated as of October 1, 2019 (the "Original Agreement"). The Amended Agreement has been unanimously approved by the Boards of Directors of both companies.

Under the terms of the Amended Agreement, Lantheus will acquire all of the issued and outstanding shares of Progenics common stock at a fixed exchange ratio whereby Progenics stockholders will receive, for each share of Progenics stock held at the time of the closing of the merger, 0.31 of a share of Lantheus common stock, increased from 0.2502 under the Original Agreement, together with a non-tradeable contingent value right ("CVR"). The CVR is payable in two separate cash payments if PyLTM (18F-DCFPyL), Progenics' prostate-specific membrane antigen targeted imaging agent designed to visualize prostate cancer currently in late stage clinical development ("PyL"), exceeds net sales thresholds of $100 million in 2022 and $150 million in 2023. As a result of the increase in the exchange ratio, following the completion of the merger, former Progenics stockholders' aggregate ownership stake will increase to approximately 40% of the combined company from approximately 35% under the terms set forth in the Original Agreement.

Mary Anne Heino, President and Chief Executive Officer of Lantheus, said, "After continued integration planning with Progenics and close collaboration with Progenics' reconstituted Board of Directors, we are even more excited about the potential value we can unlock by combining our two businesses. We remain confident that together, we will create a platform that leverages Lantheus' long-standing expertise in complex manufacturing, supply chain and commercial excellence, with Progenics' three leading FDA approved products, clinical pipeline and development capabilities. Our team enthusiastically shares the view of Progenics stockholders in the long-term growth potential of the Progenics product portfolio and, with our complementary strengths, our combined company will be better able to serve patients and healthcare professionals across the continuum of critical diagnosis and care. We are also pleased with the progress the two companies have made toward closing throughout our discussions."

Gérard Ber, Ph.D. and Mr. Heinz Mäusli, two members of Progenics' reconstituted Board, will join the Lantheus Board upon closing. Lantheus will reduce its current ten member Board to nine members at its 2020 stockholders meeting, or sooner if this transaction closes before then. Lantheus will further reduce its Board to eight members at its 2021 stockholders meeting. As previously announced, the combined company will be led by Lantheus Chief Executive Officer Mary Anne Heino, who will be supported by Chief Financial Officer Robert J. Marshall Jr., CFA, and Chief Operations Officer John Bolla.

Brian Markison, Chairman of the Board of Lantheus, said, "We are excited about the additions of Dr. Ber and Mr. Mäusli to our board. Both Dr. Ber and Mr. Mäusli add experience in radiopharmaceuticals with deep manufacturing, operating, finance and compliance experience."

Ann MacDougall, Interim Chair of Progenics' Board, said, "We have been pleased to work with Lantheus on the amended merger agreement. The Progenics' Board has unanimously determined that the combination with Lantheus under the updated terms is in the best interest of our stockholders. The merger creates a stronger

combined platform that offers an innovative and diversified diagnostic and therapeutics portfolio while ensuring stockholders the opportunity to participate in the future potential upside through enhanced ownership and the CVRs. The reconstituted Progenics Board, assisted by independent financial and legal advisors, has evaluated the business prospects and operations of Progenics as a stand-alone business as well as the value of the Progenics interest in the combined company under the revised terms in the merger transaction, and have concluded that the combination is the better path forward. We are also pleased to have our directors, Dr. Gérard Ber and Mr. Heinz Mäusli, join the Board of the combined company to enhance its prospects for future success."

David Mims, Interim CEO of Progenics, added, "We believe the combination will add significant value to both companies' stockholders, especially in light of the recent positive results we achieved with our PyL Phase 3 CONDOR trial and our product pipeline and research and development capabilities."

**Lantheus' Strategic Plan for Progenics**

As previously announced on November 7, 2019, Lantheus provided a strategic plan that provides stockholders of both companies with a clear and thoughtful strategy in which Lantheus will leverage its existing infrastructure and long-standing expertise to deliver on the promise of Progenics' product portfolio and maximize value for all stockholders. The Lantheus team remains confident in the combination with Progenics as Lantheus has a clear track record of creating significant stockholder value, built on in-house operational excellence, commercial expertise, financial discipline and robust corporate governance.

In addition, through its extensive due diligence process and continued discussions with the Progenics Board, Lantheus has identified actions and investments in 2020 that will help enhance the progress of AZEDRA and the PyL and 1095 programs. Lantheus remains well-positioned to ensure that the Progenics portfolio has the benefit of access to cost-effective capital, manufacturing capabilities, logistical support and personnel resources to succeed.

With a focus on commercial, operational and clinical enhancements under the management of its proven team, Lantheus' strategic plan represents the highest value, most certain and expedient path forward to drive significant, long-term value for stockholders of both Progenics and Lantheus.

**Strong Financial Rationale**

As a result of the recently reported positive top line results from the PyL Phase 3 CONDOR trial and ongoing integration planning, Lantheus believes this combination can generate double digit revenue growth, as well as drive margin expansion through the previously disclosed 2023 planning horizon. Accordingly, Lantheus continues to believe it can achieve adjusted EPS accretion in the third

year following the close of the transaction.

**Additional Transaction Details**

Lantheus has also agreed to make available to Progenics up to $10 million of bridge financing on terms mutually agreed upon by the parties. The merger transaction is expected to close early in the second quarter of 2020, subject to approval by Lantheus and Progenics stockholders and satisfaction of other customary closing conditions.

Upon completion of the acquisition, the combined company will continue to be headquartered in North Billerica, Massachusetts and will trade on the NASDAQ under the ticker symbol: LNTH.

**Advisors**

SVB Leerink LLC is acting as financial advisor and White & Case LLP is acting as legal counsel to Lantheus. Progenics engaged BofA Securities, Inc. as financial advisor and previously engaged Jefferies LLC as existing lead financial advisor. Covington & Burling LLP and Mayer Brown LLP serve as independent legal advisors to Progenics.

Lantheus' comprehensive strategic plan, along with additional documents related to its proposed acquisition of Progenics, can be viewed at www.lantheusprogenics.transactionannouncement.com/, and can also be viewed on the SEC's website at www.sec.gov.

**About Lantheus Holdings, Inc. and Lantheus Medical Imaging, Inc.**

Lantheus Holdings, Inc. is the parent company of LMI, a global leader in the development, manufacture and commercialization of innovative diagnostic imaging agents and products. LMI provides a broad portfolio of products, including the echocardiography contrast agent DEFINITY® Vial for (Perflutren Lipid Microsphere) Injectable Suspension and TechneLite® (Technetium Tc99m Generator), a technetium-based generator that provides the essential medical isotope used in nuclear medicine procedures. The Company is headquartered in North Billerica, Massachusetts with offices in Puerto Rico and Canada. For more information, visit www.lantheus.com.

**About Progenics**

Progenics is an oncology company focused on the development and commercialization of innovative targeted medicines and artificial intelligence to find, fight and follow cancer, including: therapeutic agents designed to treat cancer (AZEDRA®, 1095, and PSMA TTC); prostate-specific membrane antigen ("PSMA") targeted imaging agents for prostate cancer (PyL™ and 1404); and

- 10 -

imaging analysis technology (aBSI and PSMA AI). Progenics has three commercial products, AZEDRA, for the treatment of patients with unresectable, locally advanced or metastatic pheochromocytoma or paraganglioma (rare neuroendocrine tumors of neural crest origin) who require systemic anticancer therapy; and oral and subcutaneous formulations of RELISTOR® (methylnaltrexone bromide) for the treatment of opioid-induced constipation, which are partnered with Bausch Health Companies Inc.

26.     Progenics is well-positioned for financial growth and the Merger Consideration fails to adequately compensate the Company's shareholders. It is imperative that Defendants disclose the material information they have omitted from the S-4/A, discussed in detail below, so that the Company's shareholders can properly assess the fairness of the Merger Consideration for themselves and make an informed decision concerning whether or not to vote in favor of the Proposed Transaction.

27.     If the false and/or misleading S-4/A is not remedied and the Proposed Transaction is consummated, Defendants will directly and proximately have caused damages and actual economic loss (i.e. the difference between the value to be received as a result of the Proposed Transaction and the true value of their shares prior to the merger), in an amount to be determined at trial, to Plaintiff and the Class.

**II.     The Materially Incomplete and Misleading S-4/A**

28.     On November 12, 2019, Defendants caused the S-4 to be filed with the SEC in connection with the Proposed Transaction.  The S-4 solicits the Company's shareholders to vote in favor of the Proposed Transaction.  Defendants were obligated to carefully review the S-4 before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.  However, the S-4 misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act. On March 16, 2020, following the execution of the new

Merger Agreement, the Board authorized the filing the S-4/A that did not correct and of the violations present in the S-4. On March 19, 2020, the Board authorized the filing of a Form 424B3 Joint Proxy Statement/Prospectus that still did not correct the materially incomplete and misleading nature of the S-4.

### The Materially Misleading Sales Process

29.     During the negotiation of the of the Original Merger Agreement, Velan Capital L.P. ("Velan") was involved in a proxy fight that would lead to the removal of the majority of the Company's original board of directors and replacement with Velan nominated directors. On November 19, 2019, after the Velan directors were elected to the Board, the Board began interviewing potential financial advisors seeking to replace Jefferies LLC ("Jefferies"). S-4/A 118. The S-4/A fails to explain why the Board replaced Jefferies even though Jefferies already issued a fairness opinion and was paid for its work.

30.     When Jefferies was advising the original board of directors on the Original Merger Agreement, Jefferies performed a small market check where it contacted five potential strategic acquirors. *Id.* at 99. From the *Background of the Merger*, it does not appear that BofA conducted its own market check or contact any potential non-strategic acquirors. The S-4/A fails to explain why BofA did not conduct its own market check, or even inquire into the market check performed by Jefferies.

31.     The Company has already paid Jefferies $2.25 million for its services, and according to the S-4, will pay Jefferies $6.95 million upon the completion of the merger. S-4 137. The S-4/A is silent as to whether Jefferies will be paid the remaining $6.95 million.

32.     Compared to the Original Merger Agreement, the Merger Agreement increased the consideration shareholders will receive by 0.0598 more Lantheus shares per Progenics shares they

own and the CVR. However, the Merger Agreement failed to establish a cap or collar to the share exchange ratio. Particularly, the lack of a collar is the most detrimental aspect to Progenics shareholders. On February 20, 2020, when the Merger Agreement was executed, Lantheus stock was trading at $16.57 per share. As of April 3, 2020, Lantheus stock is trading at $10.34 per share with a low of $9.11 per share on March 18, 2020. The S-4/A fails to disclose why the Board believed a meager increase in the exchange ratio, combined with a CVR that might never be paid out, was a sufficient increase in the Merger Consideration without even considering applying a collar to the exchange ratio.

### The Materiality of Financial Projections

33.     A company's financial forecasts are material information a board relies on to determine whether to approve a merger transaction and recommend that shareholders vote to approve the transaction.  Here, the S-4/A discloses "Progenics management prepared and provided certain projections regarding Progenics' future operations for fiscal years 2020 through 2033, on a stand-alone basis, assuming Progenics would continue as an independent company, without giving effect to the completion of the merger, to the Progenics Board in connection with its evaluation of the merger, and to BofA, its financial advisor, in connection with its financial analyses[.]" S-4/A 157.

34.     Additionally, "Progenics management prepared and provided certain projections regarding Lantheus Holdings future operations for fiscal years 2020 through 2024 (other than with respect to 2019, which were provided to Progenics management by Lantheus Holdings management and reviewed and adopted by Progenics management without adjustment), on a stand-alone basis, assuming Lantheus Holdings would continue as an independent company, without giving effect to the completion of the merger, to the Progenics Board in connection with

its evaluation of the merger, and to BofA, its financial advisor, in connection with its financial analyses[.]" *Id.* at 158.

35.     When soliciting proxies from shareholders, a company must furnish the information found in Schedule 14A (codified as 17 C.F.R. § 240.14a-101).  Item 14 of Schedule 14A sets forth the information a company must disclose when soliciting proxies regarding mergers and acquisitions.  In regard to financial information, companies are required to disclose "financial information required by Article 11 of Regulation S-X[,]" which includes Item 10 of Regulation S-K.  *See* Item 14(7)(b)(11) of 17 C.F.R. § 240.14a-101.

36.     Under Item 10 of Regulation S-K, companies are encouraged to disclose "management's projections of future economic performance that have a reasonable basis and are presented in an appropriate format."  17 C.F.R. § 229.10(b).  Although the SEC recognizes the usefulness of disclosing projected financial metrics, the SEC cautions companies to "take care to assure that the choice of items projected is not susceptible of misleading inferences through selective projection of only favorable items."  17 C.F.R. § 229.10(b)(2).

37.     In order to facilitate investor understanding of the Company's financial projections, the SEC provides companies with certain factors "to be considered in formulating and disclosing such projections[,]" including:

> (i) When management chooses to include its projections in a Commission filing, *the disclosures accompanying the projections should facilitate investor understanding of the basis for and limitations of projections.* In this regard investors should be cautioned against attributing undue certainty to management's assessment, and the Commission believes that investors would be aided by a statement indicating management's intention regarding the furnishing of updated projections. *The Commission also believes that investor understanding would be enhanced by disclosure of the assumptions which in management's opinion are most significant to the projections or are the key factors upon which the financial results of the enterprise depend and encourages disclosure of assumptions in a manner that will provide a framework for analysis of the projection.*
>
> (ii) Management also should consider whether disclosure of the accuracy or inaccuracy of previous projections would provide investors with important insights

into the limitations of projections. In this regard, *consideration should be given to presenting the projections in a format that will facilitate subsequent analysis of the reasons for differences between actual and forecast results.* An important benefit may arise from the systematic analysis of variances between projected and actual results on a continuing basis, since such disclosure may highlight for investors the most significant risk and profit-sensitive areas in a business operation.

17 C.F.R. § 229.10(b)(3) (emphasis added).

38.   Here, Progenics' shareholders would clearly find complete and non-misleading financial projections material in deciding how to vote, considering that the Board specifically relied on the financial forecasts "[i]n reaching its decision to approve, and declare advisable, the merger agreement and to recommend that Progenics stockholders adopt the merger agreement[.]" S-4/A 136-38.

39.   As discussed further below, the non-GAAP financial projections used do not provide Progenics' shareholders with a materially complete understanding of the assumptions and key factors considered in developing the financial projections, which assumptions, factors and other inputs the Board reviewed.

### The Financial Projections Relied on by the Board

40.   The S-4/A discloses that "Progenics management prepared and provided certain projections regarding Progenics' future operations for fiscal years 2020 through 2033, on a stand-alone basis, assuming Progenics would continue as an independent company, without giving effect to the completion of the merger, to the Progenics Board in connection with its evaluation of the merger, and to BofA, its financial advisor, in connection with its financial analyses[.]" *Id.* at 157. The Company's management also prepared financial information for Lantheus on a stand-alone basis that was provided to the Board and BofA. *Id.* at 158.

41.   The S-4/A goes on to disclose, *inter alia*, forecasted values for projected non-GAAP (Generally Accepted Accounting Principles) financial metrics for Progenics for 2020

through 2033 for: (1) Total Adjusted Net Revenue, (2) EBIT and (3) Unlevered Free Cash Flow, but fails to provide (i) the line items used to calculate these non-GAAP metrics or (ii) a reconciliation of these non-GAAP projections to the most comparable GAAP measures. *Id.* at 158. Additionally, the S-4/A discloses forecasted values for projected non-GAAP financial metrics for Lantheus for 2020 through 2024 for (1) EBIT and (2) Unlevered Free Cash Flow, but fails to provide (i) the line items used to calculate these non-GAAP metrics or (ii) a reconciliation of these non-GAAP projections to the most comparable GAAP measures. *Id.* at 159.

42.     The S-4/A defines Total Adjusted Net Revenue as "Total Unadjusted Net Revenue [adjusted] based on Progenics management's good faith assessment as to the probability of success for Progenics' pipeline programs." *Id.* at 158 n.1. Nevertheless, the S-4/A fails to reconcile Adjusted Net Revenue to its most comparable GAAP measure or disclose the probabilities used to calculate Adjusted Net Revenue, rendering the S-4/A materially false and/or misleading. *Id.*

43.     The S-4/A defines EBIT as "a non-GAAP financial measure calculated by starting with Gross Profit and subtracting operating expenses." *Id.* at 158 n.3. Nevertheless, the S-4/A fails to reconcile EBIT to its most comparable GAAP measure or disclose all of the line items used to calculate EBIT, rendering the S-4/A materially false and/or misleading. *Id.*

44.     The S-4/A defines Unlevered Free Cash Flow ("UFCF") as "a non-GAAP financial measure which starts with EBIT and subtracts taxes payable (including impact from NOLs), potential future milestone payments to former stockholders of MIPI, the change in net working capital, and capital expenditures, and adds depreciation and amortization." *Id.* at 158 n.4. Nevertheless, the S-4/A fails to reconcile UFCF to its most comparable GAAP measure or disclose all of the line items used to calculate UFCF, rendering the S-4/A materially false and/or misleading. *Id.*

45.     Thus, the S-4/A's disclosure of these non-GAAP financial forecasts provides an incomplete and materially misleading understanding of the Company's future financial prospects and the inputs and assumptions for which those prospects are based upon.  It is clear that those inputs and assumptions were in fact forecasted and utilized in calculating the non-GAAP measures disclosed and relied on by the Board to recommend the Proposed Transaction in violation of Section 14(a) of the Exchange Act.

46.     The non-GAAP financial projections disclosed on pages 158-59 of the S-4/A violate Section 14(a) of the Exchange Act because: (i) the use of such forecasted non-GAAP financial measures alone violates SEC Regulation G as a result of Defendants' failure to reconcile those non-GAAP measures to their closest GAAP equivalent or otherwise disclose the specific financial assumptions and inputs used to calculate the non-GAAP measures; and (ii) they violate SEC Regulation 14a-9 because they are materially misleading as without any correlation with their GAAP equivalent financial metrics, shareholders are unable to discern the veracity of the financial projections.

47.     As such, this information must be disclosed in order to cure the materially misleading disclosures regarding both the financial projections developed by the Company as well as the projections relied upon by the Company's financial advisors.

### *The Financial Projections Violate Regulation G*

48.     The SEC has acknowledged that potential "misleading inferences" are exacerbated when the disclosed information contains non-GAAP financial measures[1] and adopted Regulation

---

[1]     Non-GAAP financial measures are numerical measures of future financial performance that exclude amounts or are adjusted to effectively exclude amounts that are included in the most directly comparable GAAP measure.  17 C.F.R. § 244.101(a)(1).

G[2] "to ensure that investors and others are not misled by the use of non-GAAP financial measures."[3]

49.     Defendants must comply with Regulation G.  More specifically, the company must disclose the most directly comparable GAAP financial measure <u>and</u> a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP.  17 C.F.R. § 244.100.  This is because the SEC believes "this reconciliation will help investors . . . to better evaluate the non-GAAP financial measures . . . . [and] more accurately evaluate companies' securities and, in turn, result in a more accurate pricing of securities."[4]

50.     Moreover, the SEC has publicly stated that the use of non-GAAP financial measures can be misleading.[5]   Former SEC Chairwoman Mary Jo White has stated that the frequent use by publicly traded companies of unique company-specific non-GAAP financial measures (as Progenics included in the S-4/A here) implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation. Jim Schnurr, our Chief Accountant,

---

[2]     Item 10 of Regulations S-K and S-B were amended to reflect the requirements of Regulation G.

[3]     SEC, *Final Rule: Conditions for Use of Non-GAAP Financial Measures* (Jan. 22, 2003), *available at* https://www.sec.gov/rules/final/33-8176.htm ("SEC, *Final Rule*").

[4]     SEC, *Final Rule.*

[5]     *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), *available at* https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/; Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. Times, Apr. 22, 2016, *available at* http://www.nytimes.com /2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0.

Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors.  And last month, the staff issued guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data.  I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures.  I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[6]

51.     The SEC has required compliance with Regulation G, including reconciliation requirements in other merger transactions.  *Compare Youku Tudou Inc., et al.*, Correspondence to SEC 5 (Jan. 11, 2016) (Issuer arguing that Rule 100(d) of Regulation G does not apply to non-GAAP financials relating to a business combination),[7] *with Youku Tudou Inc., et al.*, SEC Staff Comment Letter 1 (Jan. 20, 2016) ("[The SEC] note[s] that your disclosure of projected financial information is not in response to the requirements of, or pursuant to, Item 1015 of Regulation M-A and is thus not excepted from Rule 100 of Regulation G.");[8] *see Harbin Electric, Inc.*, Correspondence to SEC 29 (Aug. 12, 2011) ("Pursuant to the requirements of Regulation G, we have added a reconciliation of actual and projected EBIT to GAAP net income . . . .").[9]

---

[6]      Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), *available at* https://www.sec.gov/news/speech/chair-white-icgn-speech.html (emphasis added) (footnotes omitted).

[7]      *Available at* https://www.sec.gov/Archives/edgar/data/1442596/000110465916089133/filename1.htm.

[8]      *Available at* https://www.sec.gov/Archives/edgar/data/1442596/000000000016062042/filename1.pdf.

[9]      *Available at* https://www.sec.gov/Archives/edgar/data/1266719/000114420411046281/filename1.htm.  *See also Actel Corporation*, SEC Staff Comment Letter 2 (Oct. 13, 2010) ("Opinion of Actel's Financial Advisor, page 24 . . . This section includes non-GAAP financial measures.  Please revise to provide the disclosure required by Rule 100 of Regulation G."), *available at* https://www.sec.gov/Archives/edgar/data/907687/000000000010060087/filename1.pdf.  *See also The Spectranetics Corp.*, SEC Staff Comment Letter 1 (July 18, 2017) ("Item 4.

52.     Compliance with Regulation G is mandatory under Section 14(a), and non-compliance constitutes a violation of Section 14(a).   Thus, in order to bring the S-4/A into compliance with Regulation G, Defendants must provide a reconciliation of the non-GAAP financial measures to their respective most comparable GAAP financial measures.

### The Financial Projections are Materially Misleading and Violate SEC Rule 14a-9

53.     In addition to the S-4/A's violation of Regulation G, the lack of reconciliation or, at the very least, the line items utilized in calculating the non-GAAP measures render the financial forecasts disclosed materially misleading as shareholders are unable to understand the differences between the non-GAAP financial measures and their respective most comparable GAAP financial measures.   Nor can shareholders compare the Company's financial prospects with similarly situated companies.

54.     Such projections are necessary to make the non-GAAP projections included in the S-4/A not misleading for the reasons discussed above.   Indeed, Defendants acknowledge that "[n]on-GAAP financial measures should not be considered a substitute for, or superior to, financial measures determined or calculated in accordance with GAAP. Additionally, non-GAAP financial measures as presented by Progenics may not be comparable to similarly titled measures reported by other companies." S-4/A 158.

---

The Solicitation or Recommendation Certain Spectranetics Forecasts, page 39 . . . [P]rovide the reconciliation required under Rule 100(a) of Regulation G"), *available at* https://www.sec.gov/Archives/edgar/data/789132/000000000017025180/filename1.pdf.     The SEC Office of Mergers and Acquisitions applied Regulation G in these transactions, which reflect the SEC's official position.  Any claim that the SEC has officially sanctioned the use of non-GAAP financial forecasts for business combinations when the Board itself created and relied on such non-GAAP forecasts to recommend a transaction such as the Proposed Transaction is incorrect.  The SEC's website provides certain unofficial guidance for certain matters, called Compliance and Disclosure Interpretations ("C&DI's") which through the use of Q&As reflect the views of particular SEC staff and on which certain issuers have in the past claimed an exemption from Regulation G.  The SEC itself expressly disclaims C&DI's as they are not regulations that have been reviewed by the SEC, and the SEC expressly states that they are not binding and should not be relied on.  *See* www.sec.gov/divisions/corpfin/cfguidance.shtml (last visited Oct. 28, 2019).

55.     As such, financial projections are plainly material, and shareholders would clearly want a complete and non-misleading understanding of those projections.

56.     In order to cure the materially misleading nature of the projections under SEC Rule 14a-9 as a result of the omitted information on page 158-59, Defendants must provide a reconciliation table of the non-GAAP financial measures to the most comparable GAAP measures.

### *The Materially Misleading Financial Analyses*

57.     The summary of the valuation methodologies utilized by BofA, including the utilization of certain of the non-GAAP financial projections described above by BofA, in connection with its valuation analyses (*id.* at 149-50) is misleading in violation of Regulation 14a-9.  The opacity concerning the Company's internal projections renders the valuation analyses described below materially incomplete and misleading, particularly as companies formulate non-GAAP metrics differently.  Once an S-4/A discloses internal projections relied upon by the Board, those projections must be complete and accurate.

58.     With respect to BofA's *Discounted Cash Flow Analysis*, the S-4/A states that BofA valued both Progenics and Lantheus.  *Id.* at 152, 154.  With respect to valuing Progenics, BofA calculated the estimated present value of the standalone unlevered, after-tax free cash flows that Progenics was forecasted to generate during the calendar years ending December 31, 2020 through December 31, 2033 based on the Progenics financial projections.  *Id.* at 152.  To calculate the terminal value, BofA applied a perpetuity growth rate range of (10%) to 0% to Progenics' unlevered free cash flow for the calendar year ending December 31, 2033.  *Id.*  To calculate the present values, BofA applied a discount rate range of 10.50% to 14.0%.  *Id.*  BofA calculated the estimated present value of the net operating losses that Progenics management estimated would be utilized during calendar years 2019 through 2033 by using a discount rate range of 10.50% to 14.0%.  *Id.*

59.     With respect to valuing Lantheus, BofA calculated the estimated present value of the standalone unlevered, after-tax free cash flows that Lantheus was forecasted to generate during the calendar years ending December 31, 2020 through December 31, 2024 based on Progenics management's Lantheus financial projections. *Id.* at 154. To calculate the terminal value, BofA applied a perpetuity growth rate range of 1.25% to 2.25% to Lantheus' unlevered free cash flow for the calendar year ending December 31, 2024. *Id.* To calculate the present values, BofA applied a discount rate range of 7.75% to 10.0%. *Id.* BofA calculated the estimated present value of the net operating losses that Progenics management forecasted would be utilized during calendar years 2019 through 2024 by using a discount rate range of 5.0% to 7.0%. *Id.*

60.     With respect to BofA's Progenics discounted cash flow analysis (the "DCF"), the S-4/A does not disclose the calculated range of terminal values, the inputs and assumptions that went into the selection of the perpetuity growth rate range, whether or not BofA used the cost of equity or the weighted average cost of capital in its analysis, any of the inputs that went into calculating the Company's discount rate range, the value of the net operating losses, whether any enterprise adjustments were made nor the fully diluted shares of Progenics common stock outstanding.

61.     With respect to BofA's Lantheus DCF, the S-4/A does not disclose the calculated range of terminal values, the inputs and assumptions that went into the selection of the perpetuity growth rate range, whether or not BofA used the cost of equity or the weighted average cost of capital in its analysis, any of the inputs that went into calculating the Lantheus' discount rate range, the value of the forecasted net operating losses, whether any enterprise adjustments were made nor the fully diluted shares of Lantheus common stock outstanding.

62.     Since information was omitted, shareholders are unable to discern the veracity of BofA's discounted cash flow analyses.  Without further disclosure, shareholders are unable to compare BofA's calculations with the Company's financial projections.  The absence of any single piece of the above information renders BofA's discounted cash flow analyses incomplete and misleading.  Thus, the Company's shareholders are being materially misled regarding the value of the Company.

63.     As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's projections and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate discount rate, and the terminal value . . . ."  *Id.* (footnote omitted).  As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value . . .  The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness.  This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions[.]

*Id.* at 1577-78 (footnotes omitted).

64.     This information is especially material because both Progenics and Lantheus are currently trading far below BofA's implied per share equity value, and in order for shareholders to determine if the market downturn reflects fundamental shifts to both companies' business, the material omitted information must be disclosed.

65.     In sum, the S-4/A independently violates both: (i) Regulation G, which requires a presentation and reconciliation of any non-GAAP financial to its most directly comparable GAAP equivalent; and (ii) Rule 14a-9, since the material omitted information renders certain statements,

discussed above, materially incomplete and misleading.  As the S-4/A independently contravenes the SEC rules and regulations, Defendants violated Section 14(a) and Section 20(a) of the Exchange Act by filing the S-4/A to garner votes in support of the Proposed Transaction from Progenics shareholders.

66.     Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Transaction, Plaintiff and the other members of the Class will not be able to make a fully-informed decision regarding whether to vote in favor of the Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

67.     Further, failure to remedy the deficient S-4/A and consummate the Proposed Transaction will directly and proximately cause damages and actual economic loss to shareholders (i.e. the difference between the value to be received as a result of the Proposed Transaction and the true value of their shares prior to the merger), in an amount to be determined at trial, to Plaintiff and the Class.

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and 17 C.F.R. § 244.100 Promulgated Thereunder)**

68.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

69.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any [S-4/A] or consent or

authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

70.     As set forth above, the S-4/A omits information required by SEC Regulation G, 17 C.F.R. § 244.100, which independently violates Section 14(a).  SEC Regulation G, among other things, requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most comparable" GAAP measure.  17 C.F.R. § 244.100(a).

71.     The failure to reconcile the non-GAAP financial measures included in the S-4/A violates Regulation G and constitutes a violation of Section 14(a).

72.     As a direct and proximate result of the dissemination of the false and/or misleading S-4/A Defendants used to recommend that shareholders approve the Proposed Transaction, Plaintiff and the Class will suffer damages and actual economic losses (i.e. the difference between the value they will receive as a result of the Proposed Transaction and the true value of their shares prior to the merger) in an amount to be determined at trial and are entitled to such equitable relief as the Court deems appropriate, including rescissory damages.

## COUNT II

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder)**

73.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

74.     SEC Rule 14a-9 prohibits the solicitation of shareholder votes in registration statements that contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to

state any material fact necessary in order to make the statements therein not false or misleading[.]"
17 C.F.R. § 240.14a-9(a).

75.     Regulation G similarly prohibits the solicitation of shareholder votes by "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that measure . . . contains an untrue statement of a material fact or *omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure . . . not misleading*." 17 C.F.R. § 244.100(b) (emphasis added).

76.     Defendants have issued the S-4/A with the intention of soliciting shareholder support for the Proposed Transaction.  Each of the Defendants reviewed and authorized the dissemination of the S-4/A, which fails to provide critical information regarding, amongst other things, the financial projections for the Company.

77.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as directors and/or officers, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the S-4/A but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

78.     The Individual Defendants knew or were negligent in not knowing that the S-4/A is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction.

79.     The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the S-4/A, rendering the sections of the S-4/A identified above to be materially incomplete and misleading.

80.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the S-4/A.  The preparation of a registration statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the S-4/A or failing to notice the material omissions in the S-4/A upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

81.     Progenics is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the S-4/A.

82.     The misrepresentations and omissions in the S-4/A are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

83.     As a direct and proximate result of the dissemination of the false and/or misleading S-4/A Defendants used to recommend that shareholders approve the Proposed Transaction, Plaintiff and the Class will suffer damages and actual economic losses (i.e. the difference between the value they will receive as a result of the Proposed Transaction and the true value of their shares prior to the merger) in an amount to be determined at trial and are entitled to such equitable relief as the Court deems appropriate, including rescissory damages.

## COUNT III

**(Against the Individual Defendants for Violations
of Section 20(a) of the Exchange Act)**

84.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

85.     The Individual Defendants acted as controlling persons of Progenics within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as directors and/or officers of Progenics, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the S-4/A filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

86.     Each of the Individual Defendants was provided with or had unlimited access to copies of the S-4/A and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

87.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein and exercised the same. The S-4/A at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in preparing the S-4/A.

88.     In addition, as the S-4/A sets forth at length, and as described herein, the Individual

Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The S-4/A purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

89.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

90.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.     Enjoining Defendants and all persons acting in concert with them from proceeding with the shareholder vote on the Proposed Transaction or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the S-4/A;

C.     Directing Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing and to award damages arising from proceeding with the Proposed Transaction;

D.     Awarding Plaintiff the costs and disbursements of this action, including reasonable

attorneys' and expert fees and expenses; and

      E.     Granting such other and further relief as this Court may deem just and proper.

**<u>JURY DEMAND</u>**

Plaintiff demands a trial by jury on all issues so triable.

Dated:  April 6, 2020

                         Respectfully submitted,


                         **FARUQI & FARUQI, LLP**

                         By: *_/s/ James M. Wilson, Jr._____*
                         Nadeem Faruqi
                         James M. Wilson, Jr.
                         685 Third Avenue, 26th Floor
                         New York, NY 10017
                         Tel.: (212) 983-9330
                         Fax: (212) 983-9331
                         Email: nfaruqi@faruqilaw.com
                                  jwilson@faruqilaw.com

                         *Counsel for Plaintiff*

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF

I, Martin Johnson ("Plaintiff"), declare, as to the claims asserted under the federal securities laws, that:

1. Plaintiff has reviewed a draft complaint against Progenics Pharmaceuticals, Inc. ("Progenics") and its board of directors and has authorized the filing of a complaint substantially similar to the one I reviewed.

2. Plaintiff selects Faruqi & Faruqi, LLP and any firm with which it affiliates for the purpose of prosecuting this action as my counsel for purposes of prosecuting my claim against defendants.

3. Plaintiff did not purchase the security that is the subject of the complaint at the direction of Plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

4. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

5. Plaintiff's transactions in Progenics securities that are the subject of the complaint during the class period specified in the complaint are set forth in the chart attached hereto.

6. In the past three years, Plaintiff has not sought to serve nor has served as a representative party on behalf of a class in an action filed under the federal securities laws, except as specified below:

7. Plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States that the foregoing information is correct to the best of my knowledge.

Signed this 21st day of November, 2019.

_____
Martin Johnson

| Transaction<br>(Purchase or Sale) | Trade Date | Quantity |
|---|---|---|
| Purchase | 08/02/18 | 500 |
| | | |
| | | |